IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SHELIA CAUTHEN | ) | Case No. 06-11092 |
| | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

MEMORANDUM OPINION

This matter came before the Court for hearing on March 8, 2007 upon the Proposed Order of Confirmation filed on December 5, 2006 and the Objection to Confirmation of Plan filed by Smart Choice Title Loans (the "Creditor") on December 29, 2006. At the hearing, Tommy S. Blalock, III represented the Debtor, Rebecca A. Leigh represented the Creditor, and Anita Jo Kinlaw Troxler was present in her capacity as the Chapter 13 Trustee. The Creditor has objected to confirmation of the Debtor's plan on the grounds that the plan was not proposed in "good faith" as required by Section 1325(a)(3). 11 U.S.C. § 1325(a)(3). Based upon the arguments of counsel and a review of the entire official file, the Court finds that the Debtor's plan of reorganization was filed in bad faith, and so confirmation will be denied.

I. FACTS

The Debtor had no income in 2004 and 2005 except for Social Security disability payments. In November of 2005, the Debtor purchased a new 2006 Mercedes Benz S500 (the "Vehicle") in South Carolina for $78,000 to $79,000.[1] The Debtor testified that the Vehicle was

---

[1] The Debtor testified that the Vehicle is worth more than $52,000.00. Schedule B indicates that the Vehicle is worth $60,000.00. The NADA wholesale value of the vehicle is

1

a gift from her brother.

On July 10, 2006, the Debtor needed money for various reasons, so she submitted a Credit Application to the Creditor. The Application stated that Debtor's monthly income was $4,637.00.[2] The Debtor testified that, at the time that she submitted the Application, she worked for Woodard and Company, an asset management company, earning a net income of $3,500.00 per month,[3] and had other income of $1,137 per month. The other income came from several sources. She had another job at Ent Presents, an entertainment booking company. The Debtor also received a monthly Social Security disability payment of $579.00 for herself and a Social Security disability payment of $70.00 for each of her three minor children.[4] Lastly, the Debtor received $488.00 each month in child support.

The Application indicates that on July 10, 2006, the Debtor's rent was $900.00 per month and that all of her other expenses were $600.00 per month.[5]

---

more than $62,000.00.

[2]This amount is somewhat higher than the monthly income of $3,076.23 stated on her Schedule I, which she filed in her bankruptcy 71 days later. The Debtor offered three explanations. First, she stopped working for Ent Presents in December of 2006, which does not explain her failure to reflect income from that job on her Schedule I. Second, the Debtor's compensation at Woodard and Company decreased from $3,500.00 net in July of 2006 to $2,400.00 gross in September of 2006. Third, the Debtor no longer receives Social Security disability payments but still receives child support.

[3]The Application states that the Debtor was employed by Woodard and Company since May of 2006. Her Schedule I provides that she was employed by Woodard and Company since January of 2006. The Debtor produced a letter from Woodard and Company verifying that the Debtor was employed there in April of 2006 at a monthly salary of $3,500.00.

[4]The Debtor's disability payments ended in March of 2007.

[5]Schedule J indicates that on September 19, 2006, the Debtor's rent was $1,000.00 per month and that the rest of her expenses were $1,430.00 per month. The Debtor offers two

On July 17, 2006, the Debtor executed a Note and Security Agreement in favor of the Creditor and received $15,000.00 of loan proceeds, secured by the Vehicle (the "Loan"). The first page of the Note provides the following information. The annual percentage rate of interest is 144%. The indebtedness secured by the Note is to be paid in 18 payments of $2,071.13. The Debtor agreed to repay $37,280.32,[6] including a finance charge of $22, 265.32. The Note provides, "I have read and received a copy of this Agreement on the date indicated above and I agree to be bound by it."[7] The Note also provides: "THIS IS A HIGHER INTEREST LOAN. I SHOULD GO TO ANOTHER SOURCE IF I HAVE THE ABILITY TO BORROW AT A LOWER RATE OF INTEREST."

The Debtor used the $15,000.00 of Loan proceeds for several purposes. She paid $3,600.00 to her landlord in South Carolina for past due rent. She paid $1,500.00 to a South Carolina attorney.[8] She paid $1,500.00 to catch up past due obligations for utilities in South

---

explanations. First, she moved to North Carolina in August or September of 2006. Second, even though the Application is in her handwriting, she testified that she never read it before she signed it. Later, she testified that the information on the Application was "to the best of my ability, without something in front of me."

[6] The Debtor testified that she was not aware that the monthly payment would be "$2,100.00" and that she would pay a total of "$40,000.00."

[7] The Debtor testified that she did not read the Note before she signed it.

[8] The Debtor used $1,500.00 of loan proceeds to pay a South Carolina attorney to file suit against a third party for $250,000.00 "on a contingency basis." The payment was not listed on the Debtor's Statement of Financial Affairs. The Debtor testified that the South Carolina attorney told her that she would get her money within 60 days of filing suit. On Schedule B, the Debtor listed the value of the claim as "unknown." The Debtor testified that nothing has happened in the lawsuit. No application to employ an attorney as special counsel for the Debtor has been filed.

3

Carolina. She paid a moving company $4,500.00 to move her belongings to North Carolina.[9] After moving, she paid a $2,000.00 deposit for an apartment in Greensboro, North Carolina, and paid $1,200.00 for utility deposits.[10]

After July 17, 2006, but before the end of the month, the Vehicle was wrecked and later repaired. The Debtor did not make the Creditor aware of the wreck.

On September 19, 2006, only 63 days after she obtained the Loan, the Debtor filed her Chapter 13 bankruptcy. The Debtor never made a payment on the Note.[11]

After her 341 meeting was held on November 27, 2006, the Debtor was fired by Woodard and Company. She was rehired on February 5, 2007, and was, at the hearing date, a property manager for Woodard and Company at a then-current salary of $1,800 per month plus commissions. The Debtor's commissions are based on savings that she obtains for her employer.

On December 5, 2006, the Debtor filed her Chapter 13 plan of reorganization (the "Plan"). In the Plan, the Debtor proposes to pay $620.00 per month to the Trustee, which will decrease to $550.00 per month beginning in March of 2007. The Debtor no longer receives a salary from Ent Presents or Social Security disability payments, but she receives $1,800 per month plus commissions [12] from her job, and she receives child support, which recently increased

---

[9] In late August or early September of 2006, the Debtor moved to Greensboro to get a better job with Woodard and Company.

[10] The Debtor did not list any of these payments to creditors on her Statement of Financial Affairs.

[11] On March 18, 2007, the balance due to the Creditor was $18,806.00.

[12] The Debtor believes that she will earn from $1,200.00 to $1,800.00 in commissions each month. The Debtor has not yet received any such commissions.

to $612.00 per month. The Debtor's plan requires that a 100% dividend be paid to general unsecured creditors.

Assuming that the Debtor will receive, as she predicts, a monthly commission of at least $1,200.00, her total monthly income is now $3,612.00 gross or approximately $3,100.00 net. The Debtor's monthly expenses are $2,430.00 and the proposed plan payment is $550.00 per month. If the Debtor receives at least a $1,200.00 commission each month, then she ought to have sufficient cash flow to fund the Plan.[13]

The Plan provides that the Creditor will continue to be secured by the Vehicle and will be paid in full as provided by the Note except that the interest rate is reduced from the contractual rate of 144% to the Till rate of 9.5%. See Till v. SCS Credit Corp., 541 U.S. 465, 479-80 (2004)(formula approach is appropriate method for determining adequate rate of interest for cram down loan).

The Creditor argues that the Plan is not feasible and was filed in bad faith. As for feasibility, the Creditor argues that the Debtor's statements about her changing income are self-serving and unreliable. The Debtor has not presented reliable information to support the feasibility of the Plan. As for bad faith, the Creditor argues that the Debtor failed to list assets on her schedules and to list payments to creditors on her Statement of Financial Affairs. More importantly, the Debtor filed her bankruptcy just to avoid paying interest on the Loan at the contract rate.

The Debtor argues that the Plan proposes to pay a 100% dividend and that the Debtor had

---

[13]However, the Debtor has still not filed her 2005 tax return, and she will clearly owe gift taxes on the Vehicle. In addition, the Debtor still has not paid her February, 2007 plan payment.

no intention of filing bankruptcy when she obtained the Loan. The Debtor points out that the Creditor was charging 144% interest on the Loan.

## II. JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L), which this Court may hear and determine.

## III. ANALYSIS

A. Standard Under Section 1325(a)(3)

Section 1325(a)(3) requires that a debtor's plan be proposed in good faith in order for it to be confirmable. Id. "Congress has nowhere in the statute provided a definition of the term 'good faith.' The legislative history is similarly silent on this point." Deans v. O'Donnel, 692 F.2d 968, 969 (4th Cir. 1982). In Deans, the Fourth Circuit Court of Appeals set forth a non-exhaustive list of factors that may be considered when determining whether a debtor has proposed a plan in good faith pursuant to Section 1325(a)(3). Deans, 692 F.2d at 972. Noting that "a court must make its determination based on all militating factors," the Court wrote:

> Without attempting to be exhaustive or to establish a criteria 'check-list,' these factors might include, depending on the particular case, not only the percentage of proposed payment, but also the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor. Although the court's discretion in making the good faith determination is necessarily a broad one, the totality of circumstance must be examined on a case by case basis in order to fairly apply the statute as now

written.

Id.  To this non-exhaustive list, the Fourth Circuit has added the debtor's pre-petition conduct as a factor that may be considered.  Neufeld v. Freeman, 794 F.2d 149, 150 (4th Cir. 1986).[14]  Ultimately, "the totality of circumstances must be examined on a case by case basis . . . ."  Deans, 692 F.2d at 972; see also Neufeld, 794 F.2d at 152.  Further, "the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan. . . ."  Deans, 692 F.2d at 972 (citing 9 Collier on Bankruptcy 9.20 at 319 (14th ed. 1978) (brackets in original); see also In re Chaney, – B.R. –, 2007 WL 731153, at *3 (Bankr. E.D.Va. 2007)(same).  Finally, the "Debtor bears the burden of proving that a plan is proposed in good faith under 11 U.S.C. § 1325(a)(3)."  In re Delbrugge, 347 B.R. at 540 (citing In re Smith, 328 B.R. 797, 802 (Bankr. W.D. Mo. 2005); In re Virden, 279 B.R. 401, 407 (Bankr. D. Mass. 2002)).

B. Application of the Good Faith Standard

From a review of the circumstances of this case, the Court is left with the distinct

---

[14] The law in the Fourth Circuit on this issue remains unchanged by the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-9, 119 Stat. 23 ("BAPCPA").  Courts addressing this particular inquiry post-BAPCPA have relied on Deans and Neufeld.  See In re Chaney, – B.R. –, 2007 WL 731153, at *3 (Bankr. E.D.Va. 2007) ("In the absence of a new statutory definition for the term, it appears that Congress did not intend to depart from the judicially created standard for determining good faith.")(considering "good faith" under Section 362(c)(3) but taking guidance from Deans); In re Edmunds, 350 B.R. 636, 649 (Bankr. D.S.C. 2006)("Courts should not presume that amendments to the Bankruptcy Code alter past bankruptcy practices absent a clear indication from Congress of such intent. . . . Therefore, the Court finds that the Deans factors are each still relevant in cases filed after the effective date of [BAPCPA].")(internal citation omitted); In re Mark, 336 B.R. 260, 266 (Bankr. D. Md. 2006)(court recognized the continued validity of Deans and Neufeld); In re Bateman, 341 B.R. 540, 542 (Bankr. D. Md. 2006)(citing Deans and Neufeld); In re Delbrugge, 347 B.R. 536, 540 (Bankr. N.D. W. Va. 2006)(citing Neufeld).

impression that this case was not filed in good faith. The Debtor was not truthful about her income or expenses when completing the Application and submitting it to the Creditor. Her explanation that she did not read the Application before signing was not believable and does not help her cause. The Debtor also claimed that she did not read the Note before signing it and that she was surprised at the amount of the monthly payments and the overall finance charge. Such information was contained on the first page of the Note, and the Creditor even drew attention to it by outlining the amounts in boxes. The Debtor's testimony was also not credible on this point. Tellingly, the Debtor did not tell the Creditor that she wrecked the Vehicle shortly after she obtained the Loan proceeds, which is consistent with her failure to be completely truthful with the Creditor in the Application for the Loan.

The Debtor did not complete her bankruptcy schedules completely and accurately. She listed the value of a lawsuit as "unknown" even though she thought that she would receive $250,000.00. She failed to employ special counsel to prosecute the lawsuit or inform the Trustee about its potential value. She failed to list all of her income on Schedule I and failed to note payments to creditors on her Statement of Financial Affairs. When confronted with such errors in her schedules, the Debtor was cavalier and just shrugged off the inconsistencies as if they did not matter. They do matter. As this Court has previously stated,

> Put plainly, a debtor must make every effort to ensure that the petition, schedules, and statements are as accurate as possible, and "[n]either the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."

In re Spaulding, No. 05-10657, slip op. at 3-4 (Bankr. M.D.N.C. June 15, 2005)(quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987)).

The most convincing evidence, however, involves the Loan secured by the Vehicle. The Debtor never made the first payment on the Note and filed bankruptcy 63 days after obtaining the Loan proceeds. The Debtor clearly believes that the Creditor is charging too much interest on the Loan, but the fact remains that the Debtor understood and accepted the terms of the Note and agreed to pay such interest. Although the Plan proposes to pay the Creditor in full,[15] a review the circumstances, including the testimony of the Debtor, leaves the Court with the firm conviction that the Debtor filed her case and her Plan for the purpose of reducing the interest that she will have to pay to the Creditor, not because she was in dire financial straits.

## IV. CONCLUSION

For the reasons stated, the Plan was not filed in good faith, and confirmation of the Plan will be denied. Because confirmation is denied on the basis of bad faith, the Court need not address the issue of feasibility. If the Debtor should submit a new plan of reorganization that pays the Creditor its contractual rate of interest, the Court may well find that such a plan, if feasible, is confirmable.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

---

[15] "[S]ubstantiality of proposed repayment is but one factor to be considered in deciding if a plan has been proposed in good faith; a court must make its determination based on all militating factors." Deans, 692 F.2d at 972.

## **PARTIES IN INTEREST**

Shelia Cauthen

Tommy S. Blalock, III

Rebecca A. Leigh

Anita Jo Kinlaw Trolxer